UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **REBECCA SUMMERS** | : | CASE NO.  **C-1-02-368** |
| | : | |
| Plaintiff | : | JUDGE:  **SUSAN J. DLOTT** |
| | : | |
| -vs- | : | |
| | : | |
| **KEEBLER COMPANY, et al.** | : | **PLAINTIFF'S MEMORANDUM IN** |
| | : | **OPPOSITION TO DEFENDANT LOCAL** |
| Defendants | : | **253'S MOTION FOR SUMMARY** |
| | : | **JUDGMENT** |
| | : | |

Now comes Plaintiff, by and through counsel, and hereby submits the following

memorandum in opposition to Defendant Local 253's motion for summary judgment.  In support of

this memorandum, Plaintiff relies upon the depositions of Sharon Maul, David Richardson, and

Paul Smith and the affidavit of Rebecca Summers.

RESPECTFULLY SUBMITTED,


/s/ Mark J. Byrne
**MARK J. BYRNE - #0029243**
JACOBS, KLEINMAN, SEIBEL & MCNALLY
Attorney for Plaintiff
2300 Kroger Building
1014 Vine Street
Cincinnati, OH  45202
Tele  (513) 381-6600
Fax  (513) 381-4150
E-Mail:  mbyrne@jksmlaw.com

<u>**MEMORANDUM**</u>

**I.    <u>INTRODUCTION</u>**

On May 24, 2002 Plaintiff Rebecca Summers ("Summers") filed a complaint against The Keebler Company and the Bakery Confectionary and Tobacco Workers and Grain Millers Local 253 ("Local 253"). In the complaint, Plaintiff alleged various causes of action against both Defendants which resulted in her discharge in November 2001. Initially, Plaintiff asserted that she was an employee of The Keebler Company. Plaintiff was also a member of Local 253. The crux of the complaint centers around the belief that Local 253 breached its duty to fairly represent her with respect to her employment. (Complaint p. 6). In Count One Summers alleges a violation of 29 U.S.C. §185 by the Union. Plaintiff alleged in part that the Union had violated its duty to fair representation to Plaintiff by failing to investigate her grievance, failing to interview important witnesses, failing to obtain important documents, failing to permit and encourage Plaintiff to testify to at a grievance hearing and arbitration, failing to provide correct information regarding Plaintiff's right on the Collective Bargaining Agreement ("CBA"), maliciously and fraudulently providing false information to Plaintiff regarding level of alcohol in a person's blood stream that was subject to the discharge, by withdrawing Plaintiff's grievance in March of 2002 by misrepresenting to Plaintiff her rights and duties under the CBA, and by failing to go forward with her grievance against the Company.

In Count Two Plaintiff alleged a violation of 29 U. S. C. §185 against Keebler asserting that her discharge which occurred in November of 2001 was a violation of the CBA. In Count Three Plaintiff alleged a breach of the duty of fair representation under 28 U.S.C. §1337 and 29 U.S.C. §159(a) against the Union. In essence, Plaintiff realleged the previous allegations against the

Union. Plaintiff also asserts that the Union had violated its duty to represent her by negotiating and implementing a new drug policy as a work rule applicable to all members without a full vote of the membership. The Union also violated its duty by providing false and misleading information to Plaintiff regarding the existence or non-existence of alcohol level work rules, intentionally misleading Plaintiff regarding the Company's drug and alcohol policy and misrepresenting to her her rights under the CBA with respect to the execution of her last chance agreement.

In Count Four Plaintiff alleged a violation of Title VII against Keebler. In Count Five Plaintiff brought a cause of action for sex discrimination under Ohio law against Keebler. In Count Six Plaintiff asserted a sex discrimination claim against the Local 253 in violation of Ohio law. In Count Seven Plaintiff brought a disability claim under the ADA against the Company, and in Count Eight, Plaintiff brought a wrongful discharge claim against the Company alleging that her termination was because of her handicap.

In response, Defendant Local 253 filed a motion for summary judgment. The Union argues that it was not required to take her claim to arbitration and a cause of action only exists if its conduct towards Plaintiff was arbitrary, discriminatory or in bad faith. (Defendant's motion for summary judgment p. 4). Defendant argues that there is no evidence that its conduct towards Plaintiff was in bad faith and therefore this Court should find as a matter of law that the Union is not liable to Plaintiff for any breach of duty. (Defendant's motion for summary judgment p.5).

For the foregoing reasons, Plaintiff respectfully submits that the motion for summary

judgment should be denied.[1]

## II.    SUMMARY JUDGMENT STANDARD

This Court reviews de novo the district court's grant of summary judgment.  See, *Equitable Life Assurance Soc'y v. Poe*, 143 F.3d 1013, 1015 (6th Cir. 1998).  In a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see, *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

## III.    COUNTERSTATEMENT OF FACTS

### A.    The Implementation of a New Alcohol Policy.

The Keebler Company ("Keebler") is a Union shop.  (Maul depo. 6/4).  From May 4, 1998 through October 1, 2002 there existed a Collective Bargaining Agreement ("CBA") between Keebler and Local 253.  (Maul depo. 6/9-11; Plaintiff's depo Exh. 1).  Plaintiff's deposition exhibit 2 is the Company's substance abuse policy that allegedly became effective on April 1, 2000. (Maul depo. 6/13-16).  The policy contained a provision which identified a standard as .02 percent the level of alcohol contained in an employee's blood level which would permit the employee's termination from the Company. (Maul depo. 7/11-16).  The institution of this policy was a significant change from the prior drug and alcohol policy that existed at Keebler.  Prior to April 2000, the Keebler alcohol policy that did not identify the level of alcohol that an employee

---

[1]    Plaintiff has filed or will file a notice of dismissal of her claims against the Company.  Therefore, the claims asserted  against the Company contained in Counts Two, Four, Five, Seven and Eight will be dismissed without prejudice.

may experience in order to serve as a basis for their termination. (Maul depo. 6/12-17).[2]

The new alcohol policy was authored by Sharon Maul. She is the human resource director. (Maul depo. 5/2). She has held that position at Keebler since July of 1998. (Maul depo. 5/4). As director of human resources, she was the liaison between Keebler and the Union. (Maul depo. 5/8). She also administered the disciplinary policy for the Company, employee benefits, and addressed the personnel issues. (Maul depo. 5/8-10).

The policy identified in Exhibit 2 was initially sent to Dave Richardson, the Union president, for his review in January of 2000. (Maul depo. 10/20-24). This policy was communicated to him by letter dated January 27, 2000. (Maul depo. 10/24; Plaintiff's Depo. Exh. 10). In response to the letter, a conversation occurred between Richardson and Maul in which she told Richardson that the Company intended to implement the plan which included a substantial reduction in the alcohol level in order to justify an employee's discharge. Richardson did not protest the implementation of this policy at this time. (Maul depo. 12/4).[3]

Contrary to the representations contained in Richardson's deposition testimony, Richardson wrote on or about March 16, 2000 a letter to Maul in which he indicated that for the first time he had become aware of a change in the Company's drug policy. (Maul depo.12; Plaintiff's depo. Exh. 11). According to Richardson's March 2000 letter, the implementation of this drug policy could not be undertaken at the Company without engaging in a bargaining session

---

[2]     Prior to the implementation of Exhibit 2, an employee had to be intoxicated in order to justify their discharge from the Company. (Maul depo. 9/18-22).

[3]     Richardson admits he received a copy of the policy on or about January 27, 2000. (Richardson depo. 56/18). According to his deposition, Richardson had no problem with the implementation of the new policy. (Richardson depo. 56/21).

between the Union and the Company.  Notwithstanding the fact that Richardson allegedly had no

problem with the implementation of the policy in January of 2000, it was his opinion that as of

March 2000, the new drug policy did not apply to Keebler's employees. (Richardson depo. 63/4).[4]

In response to Richardson's letter of March 16, 2000, Maul wrote a letter dated March 17, 2000 in

which she stated as follows:

> "I received a somewhat puzzling letter from you in which you
> indicated that you were informed on March 10, 2000 by a Keebler
> employee that the Bakery had changed its drug policy.
>
> If you will recall, I personally gave you a copy of the new drug
> policy on January 27, 2000 and told you at that time... and also
> indicated the same in my letter to you...that if you had any questions
> or wished to discuss it to please let me know.  Since nearly two
> months have passed without any indication from you that you
> wanted to discuss it, I could only conclude that the BCTGM has
> accepted this change in policy.

If you have any questions, please contact me."  (Plaintiff's depo. 12).  In response to this letter,

Richardson did nothing. (Maul depo. 13/3).

        Subsequent to Maul's letter of March 17, 2000, the Company required a number of the

Keebler employees who were represented by the Union to undergo post-accident drug testing

pursuant to the implementation of a new drug policy. (Maul depo. 13/8-12).  The Union leadership

including Richardson became upset with the Company's action and filed certain grievances against

the implementation of the new Keebler drug policy. (Maul depo. 14/24).  As a result, additional

discussions occurred with Richardson and Keebler in September of 2000.  The meetings were the

result of a September 11, 2000 letter Richardson sent to Maul demanding that the new policy be

---

[4]        Contrary to other representations contained in his deposition, Richardson states
        that it was his belief that the new policy became effective in April of 2000.
        (Richardson depo. 65/16-17).

the subject of collective bargaining. (Plaintiff's depo. Exh. 13).  Specifically, Richardson wrote on

September 11, 2000:

> "In March of 2000 I faxed you a letter asking to negotiate the new
> substance abuse policy.  At this time, you still have not set a date to
> negotiate this issue.  The Union will give you one week to set a date
> to negotiate.  If we have not received an answer, we will select new
> avenues." (Plaintiff's depo. p.13).

This letter which was sent in September is contrary to Richardson's testimony that in his

opinion the alcohol policy became effective in April of 2000.  He inexplicably was still attempting

to negotiate the implementation of the policy in September of 2000. (Richardson's depo. 67/23).

Subsequent to Richardson's September 11th letter, a meeting occurred between Richardson

and Keebler in late September of 2000.  During that meeting, the Union concerns regarding the

implementation of the drug policy were discussed. (Maul depo. 16/18-24; Plaintiff's depo. 13, bate

stamp 402).  Maul made it clear to Richardson at that time that the alcohol policy was in effect and

the policy would not be changed. (Maul depo. 17/12-17).  Shortly thereafter, Maul told Richardson

that the disciplinary level for alcohol consumption would remain at .02%. (Maul depo. 18/5-7).

This alcohol level was clearly explained to Richardson prior to December of 2001. (Maul depo.

20/5-18).

After the meeting with Maul, Richardson actually contacted the International Union for

advice regarding Keebler's implementation of the .02 alcohol level.  (Richardson depo. 70/4).  He

was told by the International offices in September of 2000 that Keebler was within their rights to

implement this policy. (Richardson depo. 70/15).

**B.    Dave Richardson.**

Dave Richardson was hired at Keebler in 1970. (Richardson depo. 10/21).  He has held

various positions with Local 253 since that time. (Richardson depo. 11/23).  He was elected to position of President in December of 1999 and held that position through 2003. (Richardson depo. 13/18-23).  His duties as president included negotiating contracts, running the Union, meetings and the filing of grievances. (Richardson depo. 15/1-2).

The CBA identified as Exhibit 1 was in effect at the time of Summers' termination in 2001. (Richardson depo. 17/11).  Under the management clause, the employer was entitled to terminate an employee if they were intoxicated. (Plaintiff's depo. Exh. 1).  According to Richardson, the term intoxicated as used in the contract meant an employee should not be drinking at work. (Richardson depo. 24/5-6).  Under the contract, a person who is terminated has certain rights under the CBA. (Richardson depo. 24/12).  This includes the right to file a grievance and arbitrate their discharge. (Richardson depo. 24/16-24).  However, the right to arbitrate a grievance is left to the discretion of a Union. (Richardson depo. 25/8).

Richardson also identified Plaintiff's deposition Exhibit 2 as the Keebler substance abuse policy which was in effect on April 1, 2000 for the Keebler employees. (Richardson depo. 26/18). According to Richardson, the Company had the right to put the policy in effect for the employees. (Richardson depo. 27/8).  The .02 percent alcohol level contained in the drug policy was in effect in April of 2000. (Richardson depo. 29/2).

## C.    Summers is Suspended and Subsequently Reinstated.

In August of 2000 Plaintiff Summers was placed on suspension. (Maul depo. 20).  Keebler had determined that Summers had been at work under the influence of alcohol and thereby had violated the Keebler substance abuse.  (Plaintiff's depo. Exh. 7).  In order to return to work, Summers was required to undergo an alcohol and drug counseling program. (Maul depo. 21/5-8;

Plaintiff's depo. Exh. 6-7). By April of 2001 Summers had successfully completed the alcohol counseling and thus was eligible to return to work.

On April 12, 2001, a meeting occurred between Richardson and Summers regarding her return to Keebler. During that meeting, Maul faxed to Richardson what was referred to the Last Chance Agreement ("LCA"). (Maul depo. 22/24, 23/4; Plaintiffs depo. Exh. 9; bate stamp 332). Summers was required to sign the LCA in order to return to work. It provided in part that:

> "Summers will be returned to work immediately upon signing, with full seniority rights and privileges provided she submits a negative drug screen. Her drug screen must occur no later than April 19, 2001.
>
> Furthermore, Ms. Summers must agree to submit to drug/alcohol testing at the Company's request and would be subject to such random testing for 18 months from the date of this agreement. This provision will be extended by the amount of time not worked. Should Ms. Summers test positive for either alcohol or drugs, she will be terminated." (Plaintiff's depo. Exh. 8, bate stamp 328).

The document was signed by Summers, Richardson and Sharon Maul on April 26, 2001. (Plaintiffs depo. Exh. 8, bate stamp 328).

At the April 12, 2000 meeting, Richardson explained the agreement to Summers. Richardson told Summers that the agreement allowed Keebler to random drug test Summers for the next 18 months. (Smith depo. 24/4-6). He specifically told her that in order to constitute a positive test under the drug policy, she needed to test at an alcohol level of .10 or greater. (Smith depo. 24/7-8).[5] If she tested less than .10%, then that would be considered a negative result and she would be entitled to return to work. (Smith depo. 24/8-9). He further stated that the standard

---

[5] Paul Smith is an employee of Keebler, a member of the Union, and Summers' friend who was present during various discussions which occurred in this case.

applicable to Summers was the State of Ohio alcohol provision which provided for an alcohol level of .10% or greater. (Smith depo. 24/17-20). Finally, Richardson told Summers before she executed the agreement that under the agreement she could still drink a beer as long as you don't test higher than .10%. (Smith depo. 25/6-7; 86/22-24).[6] Richardson made these statements to Summers notwithstanding the fact that he knew as early as April of 2000 that .02 alcohol level would violate the Keebler alcohol policy. (Richardson depo. 50/7).

With respect to the Last Chance Agreement signed by Summers in April 2001, the Union does not recognize the use of these agreements by Keebler. (Richardson depo. 37/8-12). Instead the Union grants the employee discretion regarding entering into these agreements. (Richardson depo. 37/3). Nothing exists in any Union rules or regulations which permits an employee to exercise the discretion to enter into such an agreement. (Richardson depo. 38/14). Instead, the Union permits these agreements to be signed by the employee notwithstanding the fact that the CBA does not permit any side agreements under Article 18. (Richardson depo. 40/24; Plaintiff's depo. Exh. 16, p.30). Moreover, there is nothing in the CBA that allows these type of last chance agreements. (Richardson depo. 44/20).

Subsequent to the execution of the LCA, Keebler did not experience any problems with Summers. (Maul depo. 32/7; 33/5). Summers was requested to undergo several drug tests and passed all of those until late November 2001. On November 27, 2001 Summers was tested while at work. The test results showed a .030% alcohol level. (Maul depo. 33/8). A second test was

---

[6]     Richardson states he does not remember talking to Smith about the definition of positive prior to the executive of the agreement. (Richardson depo. 46/23). He states his understanding of the term positive meant if she came to work drunk, she could be fired. (Richardson depo. 47/2).

administered which registered a .025 alcohol level. (Maul depo. 33/11). Summers contended that

these levels occurred in part because of her ingestion of cough medicine and certain cough drops

prior to reporting for work. (Smith depo. 44/2-7). Summers also admitted to drinking one or two

beers the evening before she reported to work at 3:00 a.m. (Summers depo.73-80). Nevertheless,

as a result of these test readings, Summers was suspended from work for violation of the alcohol

policy which prohibited an alcohol level of .020 percent for an employee while at work. Summers

was surprised at the suspension as she believed that she had not done anything wrong. (Smith

depo. 43/19-23). On November 30, 2001 Summers was terminated from her employment for a

violation of the LCA. (Maul depo. 37/15). The violation occurred because she had tested positive

for alcohol. But for the fact that Summers tested positive for alcohol she would not have been

terminated. (Maul depo. 39/8; Plaintiff's depo. Exh.8).

      **D.**    **Post Termination Proceedings.**

     After Summers was terminated on November 30, 2001 Richardson falsely told Paul Smith

that Richardson had never seen the alcohol policy which permitted an employee termination

testing at a .02% or higher.[7] (Smith depo. 30/12-15; 85/18). Richardson further told Smith that

the policy identified as Plaintiff's deposition Exhibit 2 was not binding because he had never

agreed to it and did not sign off on it. (Smith depo. 30/13-15; 85/20-22). Richardson stated that

the .02 alcohol level was totally ridiculous. (Smith depo. 31/5). The .030 and .025 readings were

not a positive test under the LCA. (Smith depo. 69/20-23). Thus, since Richardson had never

agreed to the policy, he would file a grievance on Summers' behalf. (Smith depo. 31/6-7).

---

[7]     Richardson's advice throughout these proceedings were critical for Summers
since she had never received a copy of the new alcohol policy. (Smith depo.
31/14-15; 65/2-4)

After Summers' termination, Smith talked to Richardson on several other occasions.

Richardson stated that he would pursue the Summers' grievance to a final arbitration if necessary.

(Smith depo. 46/3-4).  Richardson's reason being that he had never agreed to the new alcohol

policy. (Smith depo. 46/7-9).  Thereafter, on December 3, 2001, Richardson filed a grievance on

behalf of Summers agreeing with Summers that her termination was not a violation of the LCA.

(Richardson depo. 74/17; Plaintiff's depo. Exh. 14).  According to Richardson, the .030 test result

for Summers was not a positive test pursuant to the LCA.  The grievance was filed by Richardson

knowing she had drank alcoholic beverages the evening before she reported to work at Keebler.

(Richardson 81/3-5).[8]  Prior to filing the grievance on Summers' behalf, Richardson wrote to the

International Union and specifically Jim Condra relating to Summers' termination. (Plaintiff's

depo. Exh. 15).  In the communication to the International Union asking for advice relating to the

processing of her grievance, he wrote as follows relating to Sharon Maul:

> "She never gave me this policy.  The Fed is .04, the State is .10, they
> are harassing her.  Sharon told me and Gary .10 months ago."

(Richardson depo. 84/12; Plaintiff's depo Exh. 15).  When Richardson's deposition was taken on

October 7, 2003, he admitted that he had lied in the letter to Condra. (Richardson depo. 93/18).[9]

**E.    Pursuit of The Grievance by The Union.**

During the grievance process, Keebler denied the grievance filed by Summers at the first

---

[8]    Richardson's actions were irrational and arbitrary if one believes that Richardson knew the alcohol policy at the time he filed the grievance was the .02% alcohol level. (Richardson 83/14).

[9]    With respect to this communication to Condra, Maul denies she ever told Richardson she was unaware of the alcohol level violation of the policy or that it was .10.  (Maul depo. 19/11-20)

level of review. (Richardson depo. 99/18; Plaintiff's depo. Exh. 17, bate stamp 407).  At the

second level of review on February 11, 2002 it was the Union's position relating to Summers'

discharge:

> "The union contends that the drug test was unfair that grievant tested
> below for alcohol under the standards provided in the drug and
> alcohol policy.  The Union contends that the last chance agreement
> was unfair."

(Plaintiff's depo. Exh. 17, bate stamp 406).  Richardson agreed with the Union's position at this

time. (Richardson depo. 105/3-9).  Incredibly, Richardson testified at his October 2003 deposition

that in February of 2002, he was still trying to fight the .02 alcohol policy that the company had

implemented two years prior with his knowledge, agreement and understanding. (Richardson depo.

108/16).  The Union thereafter held an executive board meeting on March 10, 2002.  At that time,

the Union Committee voted not to proceed with arbitration. (Plaintiff's depo. Exh. 18).  A letter

was sent on March 11, 2002 which completely reversed the Union's previous position regarding

Summers, and that Local 253 had decided to withdraw her grievance and not proceed with her

claim to arbitration. (Plaintiff's depo. Exh. 19).

**IV.   THE ACTIONS OF THE UNION TOWARD SUMMERS WERE ARBITRARY, CAPRICIOUS AND A VIOLATION OF THE UNION'S DUTY OF FAIR REPRESENTATION (COUNT III OF PLAINTIFF'S COMPLAINT).**

In Count Three, the Plaintiff has alleged that the Union violated its duty of fair

representation towards her.  Defendant has not asserted any claim should be dismissed, but only

Local 253's actions towards Plaintiff were not arbitrary, capricious, in bad faith, nor a violation of

its duty of fair representation.

The duty of fair representation is set forth by the Sixth Circuit and based upon 28 U.S.C.

§1337.  Section 1337 confers jurisdiction over cases involving the independent relationship

-13-

between the union members and her union without regard to a collective bargaining agreement. *Vencal v. International Union of Operating Engineers*, 137 F.3d 420 (6th Cir. 1998), quoting from *Breininger v. Sheet Metal Workers International Assoc., Local Union No. 6*, 493 U.S.67, 83 (1989). Under Section 1337, jurisdiction exists where a cause of action arises under a congressional act relating to commerce. Section 1337 provides jurisdiction for fair representation suits because the duty of fair representation derives from the National Labor Relations Act and the NLRA is an act of Congress regulating commerce. In this context, the fair representation claim is a separate cause of action for many possible suits against the employer. *Vencal v. International Union of Operating Engineers, supra*.

Section 9(A) of the National Labor Relations Act by virtue of its grant of the exclusive representation status to a union over employees that make up a bargaining agreement creates a duty of fair representation on the representative union. *Pratt v. United Automobiles Aerospace & Agriculture Implement Workers of America, Local 1435,* 939 F.2d 385 (6th Cir. 1991). The breach of the duty of fair representation flows due to the union's statutory position as exclusive representative and exists both before and after execution of a collective bargaining  agreement. *Pratt v. Local 1435*, *supra*, quoting from *Storey v. Local 327*, 759 F.2d 517, 523 (6th Cir. 1985). 29 U.S.C. §159(a) in conjunction with 29 U.S.C. §1337 creates a jurisdictional basis for breach of the duty of fair representation, independent of Section 301. *Pratt v. Local 1435, supra*. Plaintiff's allegations that Defendant acted arbitrary and capricious is not subject to summary judgment.

In this case, the Union's breach of its duty of fair representation occurred as follows:

      1.      Richardson and the Union had the Plaintiff sign a LCA which was not authorized by the CBA in April of 2001.

2.      Richardson and the Union had the Plaintiff sign a LCA agreement which the Union as late as February 11, 2002 had characterized as unfair.

3.      Richardson and the Union misrepresented to Plaintiff in April of 2001 that in order to test positive on the LCA, her alcohol level needed to be .10% or higher when Richardson knew that the new drug and alcohol policy implemented by the company a year earlier had lowered the level to .02%

4.      In April of 2001, Richardson and the Union actually told Plaintiff that it was okay to drink alcohol as long as the level in her blood did not exceed .10%.

5.      In December of 2001, Richardson misrepresented to the Plaintiff that he had never seen the drug and alcohol policy that was implemented in January of 2000 when in fact he had reviewed it almost two years earlier, discussed it with representatives from Keebler in September of 2000, and apparently had agreed to its implementation.

6.      Richardson knew the level of alcohol that would be required in order to be in violation of the drug and alcohol policy was .02.  He again misrepresented to Summers in December of 2001, that if the level of alcohol did not exceed .10, it would not be a positive test under the LCA.

7.      Richardson asserted in December of 2001, that the drug and alcohol policy identified as Plaintiff's deposition exhibit no. 2 was not binding because he had never agreed to it and did not sign off of it.

8.      Richardson stated to Plaintiff in December of 2001 that the .02 alcohol level was totally ridiculous.

-15-

9.    Richardson stated to Plaintiff in December of 2001 that the .030 and .025 readings that occurred on November 27, 2001 were not positive tests under the LCA.

10.    Richardson and the Union represented to Plaintiff that they would pursue the grievance to a final arbitration if necessary because Richardson had never agreed to the new alcohol policy.

11.    Richardson and the Union filed a grievance on behalf of Summers, agreeing with Plaintiff that her termination was not a violation of the LCA.

12.    Richardson and the Union in December of 2001 lied to Jim Condra in the International Union alleging that Maul had never given him the new Keebler alcohol policy that contained the .02 level, and misrepresented that Sharon Maul had told him that the level would be .10.

13.    Richardson and the Union represented to Plaintiff on February 11, 2002, that the drug test was unfair and that she had tested below the alcohol standards provided for in the drug and alcohol policy.

14.    Richardson represented that in February of 2002, he was still attempting to fight the .02 alcohol policy that the company had implemented two years prior without his consent.

15.    Finally, the Union on March 10, 2002 withdrew Summers' right to proceed to arbitration when Richardson had promised that he would ensure that her grievance would go to arbitration.

These facts create an issue of material fact regarding the issue of whether the Union 's

-16-

action in having Summers execute the LCA, filing a grievance and then withdrawing the same was

arbitrary, capricious and in bad faith.  Thus, the Defendant's motion is without merit.  Based on

the foregoing, it is clear that a material issue of fact exists as to whether or not the Union breached

its duty to the Plaintiff and Plaintiff is entitled to damages.

RESPECTFULLY SUBMITTED,


/s/ Mark J. Byrne
**MARK J. BYRNE - #0029243**
JACOBS, KLEINMAN, SEIBEL & MCNALLY
Attorney for Plaintiff
2300 Kroger Building
1014 Vine Street
Cincinnati, OH  45202
Tele  (513) 381-6600
Fax   (513) 381-4150
E-Mail:  mbyrne@jksmlaw.com


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 1, 2003, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Patricia Anderson Pryor, Taft, Stettinius & Hollister, Attorney for Defendant Keebler Company, 425 Walnut Street, Suite 1800, Cincinnati, Ohio, 45202-3957, at pryor@taftlaw.com; Roger A. Weber, Taft, Stettinius & Hollister, Attorney for Defendant Keebler Company, 425 Walnut Street, Suite 1800, Cincinnati, Ohio, 45202-3957, at weber@taftlaw.com; and James B. Robinson, Kircher, Robinson & Welch, Attorney for Defendant Bakery, Confectionery & Tobacco Workers' and Grain Millers Local 253, 1014 Vine Street, Suite 2520, Cincinnati, Ohio, 45202, at kircher@fuse.net.


/s/ Mark J. Byrne
**MARK J. BYRNE - #0029243**
Attorney for Plaintiff