128

1  she might have.  Any problem with that?
2          MR. SEIBEL:  Other than what we've
3  discussed.  Mark is normally very reasonable when it
4  comes to this stuff.
5          MS. PRYOR:  We'll just hold it open till
6  we get those, and if there's anything we need to
7  follow up, we can --
8          Jim, do you have questions?
9          MR. ROBINSON:  Yeah.
10
11                     - - -
12 BY MR. ROBINSON:
13     Q.   My name is Jim Robinson.  I'm a lawyer for
14 Local 253.
15          Have you had any problems with Dave
16 Richardson over the years?
17     A.   Not too much, no.
18     Q.   Well, any problems at all?
19     A.   Other than him putting me off on stuff,
20 you know, as far as trying to help me do something,
21 get him, you know, information.
22     Q.   What has he put you off on?
23     A.   Well, for instance, when I kept trying to
24 call him about if he was going to pursue my case and

129

1  stuff like that, he kept telling me he had to get
2  back with me and he was going to have to go to this
3  meeting or that meeting and they would have to agree
4  on if he was going to, I guess, try to help me or
5  not.
6      Q.  Okay.  This was in the year 2001?
7      A.  Yes.  I believe so.
8      Q.  Okay.  Did he eventually get back to you?
9      A.  Eventually.  That's when basically he told
10 me that they had dropped my case.
11     Q.  Okay.  Aside from that, any problems with
12 Richardson?
13     A.  No.  I don't think so.
14     Q.  Any problems with any of the other union
15 officials?
16     A.  No.  Only other ones I ever knew was Banum
17 and at the time Jim Hamilton.  That's the only two I
18 really ever sort of work with.
19     Q.  Okay.
20     A.  In the union office.
21     Q.  Was Paul Smith a union official at any
22 point?
23     A.  I'm not sure, but I think at one time he
24 might have been a steward.  But I'm not sure.

EXHIBIT B

63

1   Q.   Why do you believe that?

2   A.   Because he said Sharon faxed him
3   something, but he didn't let me read it.
4   Q.   He didn't let you read it, you don't
5   know --
6   A.   I don't know what was in it.  I know
7   he received a fax from her, and I'm sure that was
8   basically what was in it, because that's when he
9   talked about the 24 months, and that was negotiated
10  and he said we'll go to 18 months.
11  Q.   So you know parts of that were
12  changed, parts of the agreement?
13  A.   Yeah, they had been.
14  Q.   And you were not involved in the
15  conversation where she actually signed the
16  agreement?
17  A.   No, I was not there, I was not
18  present.
19  Q.   Did you ever see a copy of the
20  agreement?
21  A.   Afterwards.
22  Q.   And when it said -- referred to the
23  substance abuse policy, what did you take that to
24  mean?

Spangler Reporting Services, Inc.

PHONE (513) 381-3330    FAX (513) 381-3342

1  she signed that, she went -- I don't think they
2  faxed it.  She went to Keebler with Dave Richardson
3  to meet with Sharon Maul at the Keebler Human
4  Resource office, her office, and that's when the
5  agreement was presented and they signed.  I wasn't
6  there when they signed the agreement.
7       Q.   Okay.  That happened after the
8  conversation that you just talked about?
9       A.   That happened days later.
10      Q.   Okay.
11      A.   I think they had the first meeting
12 and Sharon got tide up and wasn't there for it, and
13 they rescheduled.  It was within probably seven to
14 ten days after the original offer was made, and it
15 was modified down to 18 months and whatever.
16      Q.   Okay.  But you recommended that day
17 of this meeting that Becky go ahead and sign?
18      A.   I told her, Becky -- they told her, I
19 said -- Dave Richardson told her, Becky, you don't
20 have a choice.  You either have to sign this
21 agreement or you're fired.
22      Q.   I'm asking what advice you gave her?
23      A.   I told her, I said, Becky, as far as
24 I'm concerned, you don't have a choice.

1   Q.   But was that accurate?

2   A.   Please?

3   Q.   Was that accurate?

4   A.   The information she was given at that time it was accurate, because they told her you either sign the agreement or you're fired.

7   Q.   Do you have any reason to doubt that she would have been fired if she didn't sign the agreement?

10  A.   No.

11  Q.   Did you know at that point what the agreement said?

13  A.   No, I don't know what the specific language was. I had not read it at that point until after she had signed it. I know there was a different -- I did not know it at that time, but I've learned after the fact that there was a separate substance abuse policy put into effect by Keebler.

    At that point when she signed that agreement I had not read the agreement, I had not seen it. I did not know there was another agreement in effect. I was told they had mailed some out to us, but I had not receive one at home.