IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Rebecca Summers                         :
                                        :    Case No. C-1-02-368
              Plaintiff                 :
                                        :    District Judge Susan J. Dlott
        v.                              :
                                        :    ORDER GRANTING
Keebler Co. *et al*                     :    SUMMARY JUDGMENT
                                        :
              Defendants                :


This matter comes before the Court on Defendant Bakery, Confectionary & Tobacco Workers and Grain Millers, Local 253 ("the Union")'s Motion for Summary Judgment. (Doc. #17.) Plaintiff Rebecca Summers alleges that the Union breached its duty of fair representation under 28 U.S.C. §§ 185 and 159(a) by failing to adequately investigate Summers' termination and arbitrate her grievance and by agreeing to Defendant Keebler's implementation of a substance abuse policy ("the Policy") without a full vote of the Union's membership. For the foregoing reasons, the Union's motion is **GRANTED**.

I.      **FACTUAL BACKGROUND**

From 1984 until 2001, Plaintiff Rebecca Summers was an employee of the Keebler Company and a member of the Union. Relations between Keebler and the Union are governed by a collective bargaining agreement ("CBA"). On April 1, 2000, Keebler's new substance abuse Policy went into effect, providing that an employee who reported to work with a blood alcohol level of .02 percent or greater was in violation of the Policy and eligible for termination. In January of 2000, Keebler

1

human resources director Sharon Maul had a conversation with Union president Dave Richardson about Keebler's upcoming implementation of the Policy and sent Richardson a copy of the new Policy. On March 16, 2000, Richardson wrote a letter to Maul stating that he had become aware of the Policy for the first time and that the Policy could not be implemented without a bargaining session between the Union and Keebler. In September of 2000, the International Union told Richardson that Keebler was within its rights to implement the policy.

On August 29, 2000, after drinking all night until her 3 a.m. reporting time, Summers arrived at work intoxicated, was taken to the hospital, and tests revealed that she had a high blood alcohol level. Summers was suspended pending completion of a rehabilitation program. Keebler reinstated Summers pursuant to a last chance agreement, whereby Summers agreed to submit to random drug and alcohol testing for eighteen months, and whereby Summers agreed that should she test positive for alcohol or drugs, she would be terminated. The last chance agreement specifically stated that "[i]t is understood and agreed that should Ms. Summers be terminated for violation of the Substance Abuse Policy, the parties may grieve the appropriateness of the charge only and cannot contest the degree of penalty." (Summers depo. at exh. 9.)

According to Summers, some time after she signed the last chance agreement, Dave Richardson told her that, according to state law or the "OSHA policy," as long as Summers tested lower than .10 on her drug test she would be under the limit. (Summer's depo. at 65.) Summers called "Highway Patrol" to find out "what the exact legal, you know, for testing positive would be if they picked me up on the road . . . " (id. at 65-66), although she admitted that the Highway Patrol would not have been able to tell her what Keebler's limit was. (Id. at 66.) Summers also admits that Richardson never told her he had spoken to Keebler regarding a .10 limit, and, further, that she was

2

not even sure what he was referring to when talking about a .10 policy.  (Id. at 66-67.)  Summers'
friend and coworker, Paul Smith, testified that the meeting between Summers and Richardson was
before signing the agreement, and that Richardson told Summers that the alcohol limit was
"basically the same as the State of Ohio" and that if "you got pulled over by the police at that time,
you had to be .10 or greater to be a positive or under the influence."  (Smith depo. at 24.)  Despite
whatever Richardson may have represented to her, Summers admits that she had no idea what the
Policy's limits were, but that "everybody at Keebler" said they drank several drinks each night
before work and did not "just wait till Friday or Saturday and then stop on Sunday."  (Summers
depo. at 108-09.)  Finally, Summers reiterated in her testimony that her conversation with
Richardson about the ".10 limit" occurred after the positive drug test that eventually resulted in her
termination.  (Id. at 70-71.)

         At work on November 27, 2001, Summers was tested randomly for drugs and alcohol and
found above the .02 limit.  Summers was terminated on November 30, 2001 for violating her last
chance agreement.  After Summers' termination, Richardson filed a grievance on Summers' behalf:
"Unjust discharge, no violation of last chance agreement.  I want my job back and made whole."
(Doc. #1 exh. 3.)  Richardson filed the grievance because Summers told him she had not been
drinking. (Richardson depo. at 77.)  Richardson knew Summers had been drinking the night before,
so he took her statement to mean that she had finished drinking many hours before reporting to work
and that the alcohol would have left her system.  (Id. at 80-82.)  Richardson then faxed Jim Condran
at the International Union that "She never gave me this policy.  The Fed is .04.  The State is .10.
They are harassing her.  Sharon told me and Gary .10 3 months ago."  (Plaintiff's exh. 15.)
Richardson testified that at the time he faxed Condran, he had received the Policy but forgotten that

he had, that he was not sure of the "fed" and "state" limits, and that the harassment to which he referred in the fax concerned Summers' relationship with Paul Smith.  (Richardson depo. at 85-88.) Richardson also testified that he had thought Maul told him the limit under the Policy was the same as "Ohio for driving," but upon further reflection, Maul had probably said that she did not yet know and would have to "look and see."  (Id. at 91-92.)

Keebler denied Summers' grievance on December 3, 2001 (Summers depo. at exh. 12), the Union pursued the grievance to the second level of review, and Keebler again denied the grievance. (Plaintiff's exh. 17 at bates stamp 407.)  At a March 10, 2002 meeting of the Executive Board of the Union, the Union voted not to arbitrate Summers' case.  (Plaintiff's exh. 18.)  On March 11, 2002, the Union notified Summers that they would not pursue her case at arbitration.  (Doc. 1. exh. 4.)

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  On those issues for which it shoulders the burden of proof, the moving party must make a showing that is "sufficient

4

for the court to hold that no reasonable trier of fact could find other than for the moving party."

Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted).  For

those issues on which the moving party will not have the burden of proof at trial, the movant must

"point[] out to the district court . . . that there is an absence of evidence to support the nonmoving

party's case."  Celotex, 477 U.S. at 325.

In responding to a summary judgment motion, the nonmoving party may not rest upon the

pleadings, but must go beyond the pleadings and "present affirmative evidence in order to defeat a

properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

257 (1986).  The nonmoving party "must set forth specific facts showing there is a genuine issue for

trial."  Fed. R. Civ. P. 56(e).

Although "[t]he mere existence of a scintilla of evidence in support of plaintiff's position

will be insufficient" to overcome a summary judgment motion, Anderson, 477 U.S. at 252, a court

should not grant summary judgment merely because the nonmovant's case appears weak.  The task

of the Court is not "to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial."  Id. at 249.  A genuine issue for trial exists when there is

sufficient "evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.

## III.    ANALYSIS

Summers brings this case under Section 301 of the Labor and Management Relations Act,

29 U.S.C. § 185,[1] Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a),[2] Title VII

_____

[1]Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), permits suits
against labor organizations:
    Suits for violation of contracts between an employer and a labor organization
    representing employees in an industry affecting commerce . . . or between any
    such labor organizations, may be brought in any district court of the United States

and the Americans with Disabilities Act.

In a § 301 claim, "[w]hether the employee sues both the labor union and the employer or only one of those entities, he must prove the same two facts to recover money damages: that the employer's action violated the terms of the collective-bargaining agreement and that the union breached its duty of fair representation." Chauffeurs, Teamsters, and Helpers, Local No. 391 v. Terry, 494 U.S. 558, 564 (1990) (citing DelCostello v. Teamsters, 462 U.S. 151, 164-65 (1983)). A union's duty of fair representation is inferred from § 9(a) and its grant to the union of "exclusive power to represent all employees in a particular bargaining unit." Breininger v. Sheet Metal Workers Int'l, 493 U.S. 67, 87 (1989). The Supreme Court created this duty of fair representation "because the national labor policy vested unions with power to order the relations of employees with their employer." NLRB v. Allis- Chalmers Mfg. Co., 388 U.S. 175, 181 (1967).

A.    **Breach of the CBA**

Summers alleges that she was discharged in violation of the CBA, but she produces no evidence to support her allegation. The CBA clearly states that the "[c]ompany retains the right to . . . discharge any employee who is . . . intoxicated while on duty . . ." (Doc. #1 exh. 1 at 22.) Summers does not dispute that on August 29, 2000 she was drinking until the time she reported for work, that she passed out while at work and later tested positive for alcohol. (Summers depo. at 36-

---

having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

[2] Section 9(a) of the National Labor Relations Act, codified at 29 U.S.C. § 159(a), states: Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . .

37, 48-49.)  Although this conduct would have been sufficient to discharge Summers pursuant to the above-noted CBA provision, Keebler chose to reinstate her pursuant to a last chance agreement.  The agreement specifically stated that if Summers should test positive for drugs or alcohol, she would be terminated.  (Summers depo. exh. 9).  Because Summers clearly violated the terms of the last chance agreement, her termination was not in violation of the CBA.[3]  Whether Summers received the Policy is irrelevant to whether she was terminated in violation of the CBA.  Summers also alleges that Keebler discharged her in violation of Title VII[4] and the ADA,[5] but has advanced neither argument nor evidence that Keebler's discharge was discriminatory.

---

[3]Summers also contends that because the CBA prohibits side agreements, the last chance agreement itself violates the CBA.  The language of the CBA, however, prohibits only side agreements that conflict with the CBA.  (Doc. #1 exh. 1 at 30).

[4]Summers does not argue that she is entitled to relief on her Title VII and related state law claim in her Memorandum in Opposition to the Union's motion for summary judgment (doc. #20), nor does she produce any evidence that her sex was in any way connected to her termination.  The most she alleges is that a mechanic named Tim was suspended from work less than two weeks after being intoxicated while at work and that Tim has now been discharged.  Summers cannot show that "Tim" was similarly situated to herself in all relevant respects.  Factors that tend to show that employees are similarly situated in relevant respects include but are not limited to reporting to the same supervisor, being evaluated under the same standards, and engaging in the same conduct.  Ercegovich v. Goodyear Tire & Rubber Co., 254 F.3d 344, 352-53 (6th Cir. 1998).  Summers was a line employee whereas Tim was a mechanic, Summers and Tim worked in different areas of the plant, and Summers reported to a line manager, whereas Tim reported to a mechanic supervisor.  (Summers depo. at 89-91).  Summers also alleges that male employees who were suspended were allowed to return to work while she was not.  Again, Summers cannot prove that these male employees were similarly situated to herself in all relevant respects because the employees she points to were disciplined for different conduct unrelated to substance abuse.  (Summers depo. at 95-97.)

[5]Summers also does not advance argument in support of her ADA and related state law claim in her Memorandum in Opposition to the Union's motion for summary judgment.  She admits that she does not conceive of herself as having an impairment of any kind, that she has no evidence that Keebler thought she had an impairment, and that any impairment she may possibly have does not affect her daily life.  (Summers depo. at 99-102.)

7

**B.    Breach of the Union's Duty of Fair Representation**

A union breaches its "statutory duty of fair representation . . . only when [its] conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190 (1967) (internal citations omitted).  The "three named factors are three separate and distinct possible routes" for establishing a union's breach of its duty. Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 584 (6th Cir. 1994).  The Union's actions are arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness[ ] as to be irrational." Air Line Pilots v. O'Neill, 499 U.S. 65, 78 (1991) (internal quotations omitted).  Mere negligence or poor judgment does not establish a breach of the Union's duty of fair representation. Black, 15 F.3d at 584.  A union must undertake a reasonable investigation of an employee's claims, see id. at 585, but that duty "does not require [the] union to exhaust every theoretically available procedure simply on the demand of a union member." St. Clair v. Local Union No. 515 of Int'l Bhd. of Teamsters, 422 F.2d 128, 130 (6th Cir. 1969) (internal citations omitted).  See also Damphousse v. Great Lakes Steel, 219 F. Supp. 2d 833, 837 (E.D. Mich. 2002).  "[M]erely characterizing a union's conduct as arbitrary, perfunctory or demonstrative of bad faith is insufficient to withstand summary judgment. Rather, to meet his burden of proof as to the union's breach of its duty of fair representation, a plaintiff must establish by substantial evidence that the union acted arbitrarily, discriminatorily or with bad faith." Damphousse, 219 F. Supp. 2d at 837 (citing Motor Coach Employees v. Lockridge, 403 U.S. 274, 299 (1971) (internal quotations omitted); Ratkosky v. United Transp. Union, 843 F.2d 869 (6th Cir.1988) (summary judgment granted where plaintiff fails to make a showing of bad faith, discrimination or arbitrary conduct)).

Summers claims the Union violated its duty of fair representation by not adequately investigating her grievance, by failing to interview and examine important witnesses and documents, by providing Summers with false information about her rights under the CBA and by withdrawing her grievance in March of 2002.  Construing the facts in the light most favorable to Summers, considering the "factual and legal landscape" at the time the Union performed these acts, no reasonable juror could find that the decision not to pursue investigation and arbitration was irrational.  Air Line Pilots, 499 U.S. at 67.  Summers had admittedly already violated the CBA sufficiently in August of 2000 that her behavior was grounds for discharge.  She was working under a last chance agreement that referred her directly to the Policy under which her actions would be governed, and the last chance agreement clearly stated that any violation of the Policy would result in her discharge.  Further, the last chance agreement also directed that the Union could not grieve the degree of her penalty should Summers be terminated but only the appropriateness of the charge.  Since the International Union had told the Union that Keebler could implement the Policy, Summers' breath tests showed that she was in violation of the Policy, and the last chance agreement specifically stated that violation of the Policy would result in termination, it cannot be said that the Union's decision to withdraw Summers' grievance after Keebler denied it at the first level of review was arbitrary.

Summers also contends that the Union's behavior was discriminatory because similarly situated male employees were treated differently.  However, Summers produces no evidence that the Union treated her differently on the basis of her sex or any alleged disability.[6]

---

[6]    Mr. Robinson: "Do you have any reason to think . . . that the union treats women differently than men?"
Summers: "Not to my knowledge, no."  (Summers depo. at 134.)

Summers also does not produce evidence that the Union acted with bad faith in its decision not to pursue arbitration. To show bad faith, Summer must show evidence of fraud, deceitful action or dishonest conduct. Humphrey v. Moore, 375 U.S. 335, 348 (1964). Summers has produced no evidence that Richardson's statements about the Policy stemmed from anything other than confusion or poor judgment. Most of Richardson's discussion with Summers about the alcohol limit under the Policy took place after her termination and is therefore not relevant. Prior to her discharge, if Richardson told Summer anything at all, he did not tell Summers that he had spoken with Keebler about the limit under the Policy, and Summers testified that she was not even sure what Richardson was talking about when they had the conversation. (Summers depo. at 66-67.) Summers' testimony indicates that notwithstanding Richardson's representation, she had no idea what the Policy's limits were and relied on her fellow coworkers more than any mistaken representations by the Union. Summers cannot show evidence of fraud, deceitful action or dishonest conduct on the part of the Union and therefore cannot show that the Union acted in bad faith when it withdrew her grievance.

**B.     9(a) Duty of Fair Representation Claim**

Summers also claims the Union violated its duty of fair representation under § 9(a) of the LMRA, 29 U.S.C. § 159(a), by negotiating and implementing the Policy without a full vote of the membership and by misleading Summers about the "existence or non existence" [sic] of the Policy and misrepresenting to Summers her contract rights under the CBA. (Doc. #1 at ¶ 30.) The Sixth Circuit explained in White v. Anchor Motor Freight, Inc., 899 F.2d 555, 561 (6th Cir. 1990) that "[i]n hybrid 301 claims, ... the interrelationship between a union member, his union, and his

---

Additionally, Summers testified that she was not disabled. (Summers depo. at 99-102, 134-35.)

employer is implicated." The Sixth Circuit then noted that <u>White</u> had created a test "which required that if a plaintiff's complaint stated a 'colorable claim' under the collective bargaining agreement, it must be construed as a Section 301 claim rather than a Section 9(a) claim." <u>Pratt v. United Auto., Aerospace & Agr. Implement Workers of Am., Local 1435</u>, 939 F.2d 385, 389 (6th Cir. 1991). The Sixth Circuit reiterated in <u>Adcox v. Teledyne, Inc.</u>, 21 F.3d 1381, 1888 (6th Cir. 1994) that a court will construe a plaintiff's complaint under § 301 if appropriate rather than allow plaintiffs to circumvent the two-prong test by artful pleading.

An examination of Summers' complaint shows that Summers' complaint is, indeed, a hybrid § 301 action. All actions alleged to violate the Union's duty of fair representation under § 9(a) set forth in Count III of the Complaint relate to ratifying the Policy and providing relevant information about it, thereby "misrepresenting to Plaintiff her contract rights under the CBA with the execution of [the last chance agreement]." (Doc. #1 at ¶ 30.) Count III thus makes a "colorable claim" under § 301 because Summers claims that the Union divested her of her contract rights under the CBA. Summers alleges that Keebler fired her in violation of the CBA and the Union violated its duty of representation in enabling Keebler to do so under the authority of the superceding Policy. Summary judgment is therefore appropriate because, as discussed above, Summers cannot prove a violation of the collective bargaining agreement.

Even if Count III could be interpreted as an independent cause of action cognizable under § 9(a), summary judgment would still be appropriate because Summers cannot satisfy the standards under <u>Air Line Pilots</u>. As discussed above, <u>Air Line Pilots</u> held that a union breaches its duty of fair representation only if its actions were arbitrary, discriminatory, or in bad faith, that the rule applies to all union actions, and that a union's actions are arbitrary only if in light of the legal and factual

11

landscape its actions were so outside a wide range of reasonableness as to be irrational. <u>Air Line</u>

<u>Pilots</u>, 499 U.S. 67.  <u>Air Line Pilots</u> also mandates that courts use a deferential standard in

evaluating union activity.  <u>See</u> <u>Nida v. Plant Prot. Ass'n Nat'l</u>, 7 F.3d 522, 526 (6th Cir. 1993).

Summers has produced no evidence that the Union incorrectly allowed Keebler to implement

the Policy, and the evidence shows that the International Union believed the Policy was correctly

implemented.  There is no evidence of irrational or discriminatory action or action taken in bad faith.

Summers's discussion with Richardson about the "existence or non existence" of the Policy occurred

in mid-March.  Later that month, Keebler alerted employees with an introductory letter and a copy

of the Policy.  Summers knew that the Policy was in place when she signed the last chance

agreement because the agreements specifically refers to the Policy.  Summers produces no evidence

that the Union misrepresented her contract rights under the CBA when she executed the last chance

agreement; she had admittedly already violated the CBA sufficiently in August of 2000 that her

behavior was grounds for discharge.  Summers raises no genuine issue of material fact with respect

to a breach of the Union's duty of fair representation in implementing and disseminating the Policy.

The Union's motion for summary judgment must therefore be **GRANTED**.

## IV.    CONCLUSION

Because Summers has not produced sufficient evidence to establish a genuine issue of

material fact on her claims that she was terminated in breach of the CBA or that the Union violated

its duty of fair representation, the Court **GRANTS** the Union's motion for summary judgment.

IT IS SO ORDERED.

___s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge